# Staunton

MARGARET EVANS v. THELMA EVANS SLONE AND
RUTH EVANS DALTON.

September 8, 1954.

Record No. 4250.

Present, All the Justices.

The opinion states the case.

*Strickler, Plunkett & Strickler*, for the appellant.

*Woodrum, Staples & Gregory*, for the appellees.

WHITTLE, J., delivered the opinion of the court.

On March 18, 1953, Margaret Evans filed a bill in chancery against Thelma Evans Slone and Ruth Evans Dalton praying that a deed executed by her to them on February 24, 1953, be declared null and void on the grounds that undue influence had been exercised over her by the grantees, that the deed had been executed under duress, and that her mental condition was such that the execution of it was not her free and voluntary act. It was further alleged that she "does not believe the recital contained in said deed is true."

The respondents answered the bill and denied all incriminatory allegations contained therein and asserted that the deed had been executed freely and voluntarily on the part of Mrs. Evans, and asked that the bill be dismissed.

The case was heard *ore tenus* before the chancellor who entered a decree dismissing the bill, from which decree we granted Mrs. Evans an appeal.

The record discloses that Harry K. Evans married Margaret Evans on November 21, 1922. Evans had been previously married and was the father of Thelma Slone and Ruth Dalton by the first marriage. No children were born of the second marriage. The children, then five and ten years of age, were reared by their father and stepmother, with whom they lived until they married and moved away. The evidence discloses that there was a mutual feeling of love and affection between Mrs. Evans and her stepdaughters.

On July 11, 1946, Harry K. Evans and Margaret Evans acquired the four-family apartment house here in dispute under a deed conveying the property to them as tenants by the entireties with the right of survivorship. Mr. and Mrs. Evans lived in one apartment and rented the other three. When Evans died on February 21, 1953, his widow be-

came the fee simple owner of the property under the provisions of the deed.

Upon being notified of their father's illness, Mrs. Slone came from her home in Roanoke county, and Mrs. Dalton from her home in Chase City. They did what they could to relieve the strain on their stepmother during the last illness, death and burial of their father.

After the funeral a friendly discussion was had between Mrs. Evans and her stepdaughters regarding the estate. Mrs. Slone and Mrs. Dalton testified that Mrs. Evans showed concern about a missing document which she said had been kept in the container with the survivorship deed. Mrs. Evans related that the document had the effect of leaving the property to her for life and upon her death to the respondents, and, according to the respondents, Mrs. Evans desired to have the title to the property fixed so as to carry out the intention expressed therein.

Mrs. Dalton, soon after the funeral, returned to her home in Chase City and Mrs. Slone temporarily remained with Mrs. Evans. The evidence is in conflict as to what occurred on February 24, 1953, the date of the execution of the deed now in dispute. Mrs. Evans stated that Mrs. Slone asked her for the survivorship deed, and because she did not immediately produce it Mrs. Slone angrily accused her of being "hateful", and that in order to keep peace in the family she delivered the deed to her. Whereupon, Mrs. Slone took the deed to the office of Martin, Martin and Hopkins, attorneys, and there related to W. L. Martin, a partner in the firm, Mrs. Evans' account of the missing document and its contents. Mrs. Slone requested the attorney to check into the matter and advise what was necessary to be done in order to correct the situation created by the document having been misplaced.

A search of the clerk's office was made by Martin to see if the missing document had been recorded, and upon finding that it had not, he prepared the deed in question, the preamble to which reads:

"THAT WHEREAS, Harry K. Evans and Margaret Evans executed a written instrument in which they reserved unto themselves a life estate with the remainder to the parties of the second part, and

"WHEREAS, said written instrument has been lost or misplaced, and

"WHEREAS, Harry K. Evans departed this life on February 21, 1953, and Margaret Evans, his widow, desires to execute this instrument carrying out his wishes as expressed in the instrument hereinabove referred to as lost.

"Now, THEREFORE, in consideration of Five ($5.00) Dollars cash in hand paid, and the love and affection which the party of the first part has for the parties of the second part, the party of the first part does, after first reserving unto herself a life estate, grant, bargain, sell and convey unto the parties of the second part", etc.

Later in the day Martin, with an associate of his firm, William S. Hubbard, went to the Evans apartment where the deed was read and explained to Mrs. Evans in the presence of Mrs. Slone, after which Mrs. Evans signed and acknowledged it before Hubbard, a notary public. The deed was duly recorded and soon thereafter Mrs. Slone returned to her home in Roanoke county.

The contention of the complainant is that at the time she executed the deed she was in a grief stricken condition, lacking the capacity to understand its purport; that the execution of the deed was obtained by duress and undue influence, and that she lacked the volition necessary to execute a legal document.

The respondents admitted that Mrs. Evans loved her husband and was distressed at his passing. They contended, however, that she was capable of handling her affairs, in that she paid funeral bills, collected insurance and generally attended to the unusual duties thrust upon her; that the execution of the deed was her own voluntary act, undertaken at her suggestion in order to carry out her wishes as well as the wishes of her husband; that they knew nothing

of the lost paper until Mrs. Evans called it to their attention; that Mrs. Evans' only concern regarding the property was that she have a place to live and have the income therefrom during her life, and that it was her desire contemporaneous with the execution of the deed that the remainder pass upon her death to the children of her deceased husband; that she had the full mental capacity, intention and volition requisite to the execution of the deed; that no fraud, undue influence or duress was connected with the transaction, and that no ground existed for the cancellation of the deed.

The questions raised by the assignments of error are summarized in appellant's brief as follows: Should the deed be annulled for the following reasons: (a) because the same was executed under duress and undue influence; (b) because of lack of capacity to understand the purport of the deed; (c) because of lack of volition to execute the instrument; and (d) because the execution of the deed was based upon recitals which did not exist?

Appellant neither in her brief nor in argument at bar attempted to segregate the questions presented for decision. It was argued that Mrs. Evans was so grief stricken that she was not fully cognizant of what she was doing when she executed the deed. Mrs. Evans' testimony is in keeping with this argument and the evidence of the tenants in the apartment house indicates that Mrs. Evans was grief stricken for days after her husband's death. Such evidence at the most depicts the natural emotional feelings of a wife who has lost a husband with whom she had lived happily for many years. This testimony is but a word picture of the grief and sadness surrounding a situation which is both usual and natural under such circumstances. The record as a whole convincingly shows that Mrs. Evans was at all times fully aware of what she was doing.

The evidence presented by the respondents affirmatively shows that Mrs. Evans, in executing the deed, did what she then desired to do, and that she was attempting to carry

out her own wishes and the wishes of her husband as known to her. Mrs. Slone and Mrs. Dalton had never heard of the lost instrument until Mrs. Evans told them that such had existed.

The evidence as to happenings contemporaneous with the execution of the deed bears more weight and is of more importance than the collateral evidence of what occurred before and after its execution. W. L. Martin, the attorney who prepared the deed, testified:

" * * * I asked Mrs. Evans about the paper that was purported to be lost and I explained the deed to her. I told her that if she executed the deed she would only have a life estate and that the property would go to Mrs. Slone and Mrs. Dalton after her death. I also told her that she couldn't sell it without their joining in the deed. I then read the deed to Mrs. Evans. Mrs. Evans said that that was exactly what she wanted to do, that she was doing it to protect Mrs. Slone and Mrs. Dalton. And she stated that there had been a paper in that shuck that did the same thing and that somebody had taken the paper out and that she knew who it was but she wasn't going to say."

Martin further testified that Mrs. Evans understood the provisions of the deed, fully discussed the lost paper with him, and that she was both pleasant and composed at the time the deed was executed.

William S. Hubbard, attorney and notary public, who took the acknowledgment, testified:

" * * * Well, I can't recall whether the comments were made while the deed was being read to her. But while we were there in her presence, she made the statement that there was an instrument with her papers and which had disappeared the day before, or several days before, which had carried out the intention of both her husband and herself whereby the property that we were in was to go at the death of both to his two daughters."

Hubbard was asked on cross examination: "What was Mrs. Evans' general appearance?", to which he replied:

"She appeared very calm and collected that day. She was rather perturbed that the instrument had been taken and she wanted to have one executed to take care of it." The witness further testified that Mrs. Evans stated that the deed did what the lost instrument intended to do with the property.

One cannot escape the conclusion that this suit would never have been instituted but for the intervention of outside influence. It is evident that at the time the deed was executed Mrs. Evans was attempting to carry óut both her wishes and those of her husband as purportedly expressed in the lost instrument. When Mrs. Evans' brother, P. P. Hicks, became interested the complexion of things changed. The planned litigation, and the attitude of Hicks can be gained from his testimony. After testifying that Mrs. Dalton notified him by letter of the death of Evans, he was asked:

"Q. What was the next communication you had with Mrs. Evans or her family?

"A. Well, as I came home this evening on the Wednesday, as soon as I had taken off my coat, my wife and daughter told me that Harry had passed away and that he had passed away on Saturday. So, Mrs. Hicks said, 'Well, you probably better call your sister and see how everything is down there'. So, I put in a phone call to Margaret. Of course, I offered my condolences and I asked her how everything was, how she was feeling, and so on, and I says to her, 'Margaret,' I says 'I suppose there is a lot of things to be done.' 'Now,' I says, 'there is really nothing that you have to hurry about. If you are not feeling well, when you are ready, let me know and I will come down and help you get yourself straightened out.' 'So,' I says, 'first of all,' I says, 'don't sign any papers.' And she said, 'Pete, I have signed a paper.' 'Well,' I says, 'What sort of paper was it, Margaret?' 'Well,' she says, 'I don't know.' 'Well,' I says, 'from here on,' I says, 'don't sign anything until you get yourself straightened up and you are feeling better and when you need me, I will come down.'

"So, I didn't write to my sister. That was all that I did. So, I don't know, probably a week afterwards, I got another letter from her and in that letter, why she had written, she explained the circumstances to me and it was all in such a jumbled condition, it took me a little time to figure out what it was. And still after I had read the letter, I couldn't make out what it was. So, I called again and spoke with her and, well, I couldn't get much information. Then about a week later I received another letter from her and she told me, then, in that letter that she had been to see Mr. Moomaw, a lawyer, and that the paper that she had signed, she had signed away the property. I says, 'Well,' I says, 'I guess you need me now.'

"So I arranged then to leave New York and come down. And after I arrived in Roanoke, I went home to my sister's. And so when I arrived there, Margaret told me she says that Mr. Moomaw would be here at eleven-thirty or so. I said, 'all right.' In the meantime, she had given me this conveyance to read. So in looking over the conveyance, I says to myself, well, then, suppose this is done, I said, why, it doesn't just seem right, and I talked along those lines with Mr. Moomaw when he came. And he said to us, he said, 'Well, Mr. Hicks,' he said, 'I am sorry but,' he said, 'gee, your sister has signed away everything.' 'Well,' I says, 'I don't know.' I said, 'I don't believe that that can be right. After all, it is the period of time there within three or four days after Mr. Evans had passed away and all of this here had taken place, was signed over and the condition of my sister. I just wouldn't think of it being right.'"

The suit was instituted on the heels of the brother's visit. The record discloses little interest manifested by the brother in his sister's welfare until the death of her husband. He and one sister were Mrs. Evans' only heirs at law. From Mrs. Evans' testimony it is evident that she was led to believe that she had "signed away everything", and that she could be evicted and sent to the poorhouse, when as a matter of fact she retained a life estate in the

property and was entitled to the income therefrom so long as she lived. She was satisfied with the situation until she received the unwarranted interpretation placed upon the deed.

The case turns more upon its factual aspects than upon legal grounds. It is elementary that where parties reduce their contracts to writing and acknowledge them before an officer there exists a strong presumption, in the absence of fraud and duress, that the contracts correctly set forth the understanding of the parties and equity will not lightly set them aside. The presumption that the instrument correctly expresses the intention of the parties and that it has been entered into in a proper legal manner must be overcome by clear and satisfactory proof. 16 M. J., Rescission, Cancellation and Reformation, § 24, pp. 156, 157, and authorities there cited.

When fraud and duress are relied upon to justify the cancellation of a deed and the evidence on the question is conflicting, a decree denying relief, unless clearly erroneous, will not be disturbed on appeal. 16 M. J., Rescission, Cancellation and Reformation, § 26, pp. 158, 159, 160.

This case, as stated, was heard *ore tenus* by the chancellor and his determination of the facts must be accepted unless clearly erroneous. His appraisal of the testimony under such circumstances is entitled to special respect. We cannot say that a chancellor's determination of the weight and credibility of evidence heard *ore tenus* is erroneous unless it appears to be plainly wrong or is without evidence to support the result. A decree in a chancery suit where conflicting evidence is heard in open court, has the weight of a jury's verdict or the weight of a common law judgment in a case heard by the court without the intervention of a jury. The case comes to the appellate court with all the conflicts in the evidence resolved in favor of the prevailing party. 1 M. J., Appeal and Error, §§ 277, 278, pp. 707, *et seq.*

Upon the conclusion of the case in the court below the learned chancellor said:

"Even if we assume that to a very large extent, almost *in toto*, the evidence for the complainant is true, it still does not go sufficiently far to establish the fact that Mrs. Evans on that Tuesday afternoon was not capable of understanding what she was doing and the effect of what she was doing. I just don't see any necessity for me to go any further than that.

"In my opinion, the evidence fails by a very large degree from complying with the law in cases of this kind and I feel it is my duty to deny the relief prayed for by Mrs. Evans in this case."

We concur in this ruling and the decree of the lower court is

*Affirmed.*