## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Joann B. Adams,
Darwin W. Bales, Jr.,
Bonnie S. Smith,
and Anita L. Staton

v.

Thomas Doughtie

December 31, 2003

Case No. (Chancery) 03-0484

BY JUDGE MARK S. DAVIS

This chancery matter was tried before the Court on December 2, 2003. Pursuant to Rule 2:17 of the Rules of the Virginia Supreme Court, evidence was heard orally by the Court, and, at the conclusion of the evidence and closing arguments, the Court indicated that it would take the matter under advisement and issue its decree in the form of an Opinion and Order. The procedural background, review of the evidence, discussion of the issues, and conclusion are set forth below.

## I. *Procedural Background*

The Bill of Complaint in this matter, filed on June 26, 2003, alleges that "by Deed dated November 28, 2000, and recorded in the Clerk's Office of the Circuit Court of the City of Portsmouth, Virginia, in Deed Book 1316, at page 201, Thomas H. Doughtie and Jacqueline B. Doughtie, husband and wife, were seised and possessed in fee simple absolute of" ... "real property, commonly referred to as 4754 Race Street, Portsmouth, Virginia. . . ." The property is further described as "Condominium Unit 4754 in the community known as Waters Edge Condominiums." In his Answer and Grounds of Defense, the defendant, Thomas H. Doughtie, admits those facts. The Bill of Complaint further alleges that Jacqueline B. Doughtie was the mother of the four plaintiffs and that Thomas H. Doughtie is the stepfather of the four plaintiffs, and the defendant also admitted those facts. It is further alleged that Jacqueline B. Doughtie died on December 19, 2002, which allegation was admitted by the defendant. The remaining allegations made and contained in the Bill of Complaint are denied in the defendant's Answer and Grounds of Defense.

The plaintiffs further allege in their Bill of Complaint that Thomas H. Doughtie and Jacqueline B. Doughtie entered into a valid and enforceable oral agreement with the plaintiffs in August or September of 2002 to sell the above-referenced Condominium to the plaintiffs. The plaintiffs allege that the agreed-upon purchase price was $25,000.00, with Jacqueline B. Doughtie gifting her interest in the property to the plaintiffs and Thomas H. Doughtie receiving $25,000.00 for his interest in the property. It is further alleged that on or about December 18, 2002, Thomas H. Doughtie evidenced his intent to complete the sale by signing a general warranty deed, and Jacqueline B. Doughtie conveyed her interest by signing the same deed. The Bill of Complaint also alleges that a title search subsequently revealed a problem with the title to the property and Thomas H. Doughtie assisted the plaintiffs in resolving that problem. Plaintiffs also allege that each of the four of them obtained $6,250.00 and were prepared to pay Thomas H. Doughtie a total of $25,000.00 for his interest in the subject property, pursuant to the agreement, but that Thomas H. Doughtie refused to deliver a general warranty deed to the plaintiffs when they tendered $25,000.00 to him. Plaintiffs further state that they are still ready and willing to pay the sum of $25,000.00, and to perform their part of the agreement whenever defendant Thomas H. Doughtie agrees to make and deliver to them a good and sufficient deed for the property. Accordingly, plaintiffs ask in their Bill of Complaint that the Court order the defendant "specifically to perform the agreement entered into" ... "and to make a good and sufficient general warranty deed" to the plaintiffs for the property.

## II. *Evidence at Trial*

During the trial of this matter, plaintiff Joann B. Adams testified that she was the stepdaughter of Jacqueline B. Doughtie (hereafter "Mrs. Doughtie") and that Mrs. Doughtie was married to her stepfather, defendant Thomas H. Doughtie (hereafter "Mr. Doughtie") for twenty years prior to her death. She testified that her mother and stepfather lived in Portsmouth during that time and she had regular contact with her mother. She also stated that she advised her mother of the availability for sale of a condominium unit at Waters Edge Condominiums because she knew that Mrs. Doughtie was looking for a place for her own mother, Ms. Adams' maternal grandmother, and disabled brother, Ms. Adams' uncle, to live, and a condominium unit was subsequently purchased for that purpose. Ms. Adams stated that her maternal grandmother had lived with the grandmother's disabled son in Fairwood Homes for some time and that the two of them moved from the Fairwood Homes section of the City of Portsmouth into the Waters Edge Condominium and that it was agreed that the two of them would pay rent on the property at the same rate as they were paying in Fairwood Homes, approximately $266.00 per month.

Ms. Adams testified that Mrs. Doughtie was diagnosed with cancer around December 2001 and that, in August of 2002, she visited with her mother and Mr. Doughtie in their home to discuss the future disposition of the Waters Edge Condominium. Ms. Adams stated that this conversation took place in the kitchen with her mother and stepfather present and that her mother told her that it was Mr. Doughtie's idea for the four children, the plaintiffs in this case, to purchase his interest in the property and Mrs. Doughtie would gift her interest to the children. Ms. Adams stated that she specifically remembered the conversation and that it took place in the early evening, though it was still light while they were sitting in the kitchen. In response to her mother's suggestion that the children purchase Mr. Doughtie's interest in the property, Ms. Adams stated that she agreed to do so and told her mother that she would make arrangements to obtain the $6,250.00 per person to purchase Mr. Doughtie's interest. She stated that she obtained her portion from one of her credit cards and had already begun making payments on the credit card advance by the time her mother passed away on December 19, 2002. Ms. Adams stated that no deed was exchanged with her before her mother's death, though she had several conversations with Mr. Doughtie regarding the status of each of the children's $6,250.00 and when the children might have all their money together.[1] Ms. Adams also testified that on

---

[1] This testimony by Ms. Adams as to statements made by her mother was objected to by defense counsel. While the Court observed that the testimony was not admissible under Va.

December 18, 2003, she arrived at the Doughtie's home around 6:00 p.m. and that Mrs. Doughtie was in bed. She testified that her mother knew her, Ms. Adams, and seemed to be aware of her surroundings. Ms. Adams also stated that a hospice representative arrived later that night and that there was some discussion with the hospice representative as to whether it was possible to have morphine administered to her mother.

Ms. Adams stated on cross-examination that, after Mrs. Doughtie asked her to purchase Mr. Doughtie's interest in the condominium, she, Ms. Adams, spoke to J. Wayne Sprinkle, Esq., a Portsmouth attorney, about arranging the purchase. While Ms. Adams admitted that she has purchased real estate on several occasions in the past and utilized a written contract, she stated that there was never any discussion about a written contract in this situation. Ms. Adams stated that she received her check for her portion of the purchase price on December 3, 2003. She admitted that she never verbally discussed the "terms and conditions" of the payment with Mr. Doughtie, but she did say that Mr. Doughtie approached her on several occasions inquiring when the children would take possession of the Condominium and when they would be able to pay the money for the condominium.

Plaintiff Bonnie S. Smith testified that she was the daughter of Mrs. Doughtie and the stepdaughter of Mr. Doughtie. She stated that her "Granny" and her "Uncle Willard" moved into the Waters Edge condominium on Race Street when it was purchased and that it was purchased so they would have a home. Ms. Smith testified that, around September of 2002, she spoke with Mr. and Mrs. Doughtie while they were in the kitchen one morning regarding the purchase of the condominium unit by the four children. Ms. Smith stated that her mother told her during that conversation, while Mr. Doughtie was present, that the idea to sell his interest in the condominium to the four plaintiffs was his idea. Ms. Smith also testified that Mr. Doughtie approached her several times before Mrs. Doughtie's death to inquire when the children were to have the money in order to finalize the sale and that, during those conversations, they discussed the Condominium Association fees that would have to be paid once such transfer took place. Ms. Smith stated that she advised Mr. Doughtie that she had her portion of the money, $6,250.00, during at least one of these

---

Code § 8.01-397, the so-called dead man statute, because the defendant was not being sued as administrator of the estate, the Court did admit the testimony as *res gestae. See Wright v. Rambo*, 62 Va. (21 Gratt.) 158 (1871); Charles E. Friend, *The Law of Evidence in Virginia* § 18-44 (6th ed. 2003). The Court also noted the continuing objection of defense counsel to any testimony regarding the out-of-court statements made by Mrs. Doughtie. The Court indicated, at the time, that it was accepting the testimony to show the actions that were subsequently taken by the parties, not for the truth of the matter asserted.

conversations prior to her mother's death. Ms. Smith further testified that she arrived at the Doughties', her mother's, home on December 18, 2002, around 6:00 p.m. and that Mr. and Mrs. Doughtie were there in the home along with her mother's close friend, Margaret. There was also testimony during the trial that this friend, Margaret, subsequently passed away. Ms. Smith stated that she visited with her mother the evening of December 18, 2002, but that there was no discussion regarding the signing of the deed. Ms. Smith testified that, as of the date of the trial, she was prepared to go forward with the sale and had her funds still available and she was prepared to tender payment. On cross-examination, Ms. Smith admitted that she had no direct verbal negotiations with Mr. Doughtie regarding purchasing his interest in the condominium and that her verbal discussions had taken place with Mrs. Doughtie while Mr. Doughtie was present in the kitchen.

Plaintiff Anita L. Staton next testified. She stated that she was the daughter of Mrs. Doughtie and stepdaughter of Mr. Doughtie and that she was familiar with the fact that the condominium at issue was bought for the purpose of providing her grandmother and uncle with a place to live. Ms. Staton testified that Mrs. Doughtie approached her and stated that she needed the four children, the plaintiffs, to purchase the condominium and that she told Mrs. Doughtie she would do so. Ms. Staton testified that she tried to borrow $6,250.00 from her mother-in-law but her mother-in-law needed her to wait for a short period of time until a certificate of deposit matured so that she could then loan the money to Ms. Staton. Ms. Staton testified that, some time after this conversation with Mrs. Doughtie, she was at the Doughties' home speaking to both Mr. and Mrs. Doughtie and they were discussing how the $25,000.00 agreed purchase price, for Mr. Doughtie's interest, was reached and Mr. Doughtie retrieved the original purchase contract on the condominium and showed it to Ms. Staton. Ms. Staton testified that they then discussed the fact that the $25,000.00 figure would be approximately half of the value of this property.

Without objection, plaintiffs presented the Court with a copy of the deed of bargain and sale from November 2000 reflecting the transfer of the Condominium property to the Doughties. Plaintiffs' counsel requested that the Court take judicial notice of this document, and defense counsel did not object. Va. Code § 8.01-389; *Pratt v. Kelly*, 585 F.2d 692, 696 (4th Cir. 1978) (court may take judicial notice of deed). Accordingly, the Court takes judicial notice of the 2000 deed. Also provided to the Court was a copy of the property assessment signed by a representative of the City of Portsmouth Assessor reflecting that, in 2002, the property was assessed at $52,940.00, though, in 2003, it was assessed at $54,620.00. Plaintiff's counsel requested the Court to

also take judicial notice of this document, and defense counsel did not object. The Court will treat this as an evidentiary stipulation and accept it as such.

Ms. Staton testified that she later took Mrs. Doughtie to visit Wayne Sprinkle, Esq., a Portsmouth attorney, for them to discuss preparation of a will and deed for the condominium property. Ms. Staton indicated that this visit took place in August or September 2002, on a Saturday at Mr. Sprinkle's office. Ms. Staton also testified that Mr. Sprinkle prepared a deed after this meeting and forwarded it to her home. Ms. Staton admitted on cross-examination that she never had a specific verbal conversation with Mr. Doughtie about the sale of the condominium until after the death of Mrs. Doughtie. Ms. Staton indicated that on February 1, 2003, she prepared a check for $6,250.00 and gave it to her sister-in-law, Kathy Bales, in the presence of Mr. Doughtie. She stated that she showed Mr. Doughtie the check and then she gave it to Ms. Bales who was collecting all the funds. Ms. Staton also indicated that she used to do title searches at one of her prior jobs and that she advised her sister that a title search needed to be done before any money was passed to Mr. Doughtie in order to assure that the plaintiffs obtained clear title to the property.

Ms. Staton testified that she arrived at the Doughties' home on December 18, 2002, at around 11:30 p.m. and her mother was in bed. She stated that Mrs. Doughtie's friend, Margaret, was in the bed next to Mrs. Doughtie's bed and that Ms. Staton stayed in the room with the two of them and held her mother's hand. She said Mrs. Doughtie did not speak to her, Ms. Staton, but Mrs. Doughtie did squeeze her hand when Ms. Staton spoke to her. Ms. Staton admitted on cross-examination that Mrs. Doughtie was the only one to verbally speak with her specifically about the sale of the property during the August and September 2002 time period.

Plaintiff Darwin W. Bales, Jr., next testified, indicating that he was the son of Mrs. Doughtie and stepson of Mr. Doughtie. He stated that the Doughties were both present when Mrs. Doughtie approached him requesting that he purchase the condominium along with his other siblings. Mr. Bales stated that this conversation took place in the kitchen of the Doughties' home with both Mr. and Mrs. Doughtie present. He stated that the price of $50,000.00 was mentioned during that conversation and Mrs. Doughtie indicated that she was going to gift her half interest in the property to the children, while they were to purchase the remainder from Mr. Doughtie. Mr. Bales testified that he borrowed his portion of the $25,000.00 when he refinanced his home and that the settlement sheet from his refinancing reflected a date of November 18, 2002. Mr. Bales testified that he still had his money available and was prepared to go forward with the purchase as of the

day of the trial. He testified that he spoke with Mr. Doughtie specifically about the sale of the condominium and Mr. Doughtie asked when he would have his money available. Mr. Bales testified that Mr. Doughtie "basically said" that he was just waiting for the children to get the money in order to go through with the sale. Mr. Bales admitted on cross-examination that he could not remember Mr. Doughtie's specifically verbally saying that the purchase price for his interest in the condominium was $25,000.00. Mr. Bales also testified that his understanding as to why the sale was not consummated before the death of his mother was that there were certain problems with the title search.

J. Wayne Sprinkle, Esq., also testified, indicting that he has practiced law in the City of Portsmouth since 1972 and had constantly handled many hundreds of real estate transactions during that time frame. The parties stipulated that Mr. Sprinkle is an expert in real estate transactions. Mr. Sprinkle stated that he had represented Mr. and Mrs. Doughtie in the past and had known them since approximately 1996. Mr. Sprinkle testified that he recalled that Mrs. Doughtie came to speak with him at his law office one Saturday morning, without an appointment, and was accompanied by her daughter Anita Staton and two of her nieces. Mr. Sprinkle stated that he met with Mrs. Doughtie to discuss legal matters, including the disposition of her interest in a condominium unit in the Waters Edge development. He stated that after that conversation with Mrs. Doughtie he dictated a deed to his secretary, and the deed that was prepared pursuant to his request was then admitted as plaintiffs' exhibit number one. The deed reflected a date of November 1, 2002, and Mr. Sprinkle testified that his meeting with Mrs. Doughtie took place not long before that date. Mr. Sprinkle reviewed plaintiff's exhibit number one, the deed dated November 1, 2002, and stated that he recalled Mrs. Doughtie telling him that one-half of the estimated value was to be paid to Mr. Doughtie by the children. Mr. Sprinkle testified that he recalled no conversation with Mr. Doughtie about the conveyance.

Mr. Sprinkle was subsequently shown a deed dated December 18, 2002, and it was admitted as plaintiff's exhibit number two. Mr. Sprinkle testified that "the family" had decided that Mrs. Doughtie needed to execute the deed and that it was probably prepared that day by his secretary, Jennifer Carpenter. Mr. Sprinkle stated that he directed Ms. Carpenter to go to the residence of Mrs. Doughtie to present the deed and see if it could be signed by the Doughties. Mr. Sprinkle noted that Mrs. Carpenter was a notary public, who could notarize the deed, and that she went to the home in the early afternoon. Mr. Sprinkle testified that he received two telephone calls that afternoon from Mrs. Doughtie's residence and that as a result of the first telephone call from Mrs. Carpenter he directed Mrs. Carpenter to proceed with the signing of the

document. This first telephone call resulted, according to Mr. Sprinkle, because Mr. Doughtie wanted to assist Mrs. Doughtie with the signing and Mr. Sprinkle gave approval for Mrs. Doughtie to sign the deed while Mr. Doughtie held her hand to help her. Mr. Sprinkle stated that, approximately five to ten minutes thereafter, he received a second telephone call from Mrs. Carpenter and, in response to her question, advised her that it was acceptable for her to leave the deed with Mr. Doughtie, even though it had already been signed by Mr. and Mrs. Doughtie. Mr. Sprinkle testified that he held no money in a trust account to pay Mr. Doughtie and that it was his understanding that the children were going to handle the transfer of the money directly to Mr. Doughtie. Mr. Sprinkle also testified that he had seen Mrs. Doughtie within a week prior to the execution of the deed on December 18, 2002, and that she appeared to be in control of her mental faculties at the time that he saw her.

On cross-examination, Mr. Sprinkle testified that Ms. Adams probably initiated the preparation of the second deed, reflected in plaintiffs' exhibit number two. Mr. Sprinkle testified that he did not discuss with Mrs. Doughtie the preparation of a written sales contract, in addition to the deed, because it depends upon the parties as to whether such a separate sales contract is necessary. Mr. Sprinkle further testified that, in his opinion, a real estate *contract* (versus a written memorandum satisfying the Statute of Frauds) requires a statement of the consideration for the transaction, identification of the parties, a reflection of a meeting of the minds and the intent of the parties, as well as signature. He stated that, in his opinion, a statement of a closing date was not a necessary term of such a contract unless time was of the essence. He also stated that payment terms were not necessary, though he admitted that they were usually included in such a contract with some indication as to whether payment would be made with cash or over time. Mr. Sprinkle stated that the payment time was usually close to the time of the closing date. Mr. Sprinkle further testified that any contingencies are usually placed in the contract and stated that the deed admitted as plaintiffs' exhibit number two contained contingencies, such as the requirement that there be a General Warranty and English Covenants of title as well as the fact that the conveyance was made subject to conditions, restrictions, reservations, and easements which had not expired or otherwise become ineffective. Mr. Sprinkle admitted that the deed contained no closing date, but stated that it showed consideration of $10.00 in the body of the document, while consideration was shown in the heading of the document as $25,000.00. Mr. Sprinkle testified that this deed was something between a "deed of bargain and

sale" and a "deed of gift" because it provided for payment of $25,000.00 for Mr. Doughtie's interest and a gift of Mrs. Doughtie's interest.

Mr. Sprinkle testified that the deed identified the sellers, the buyers, the property for transfer, as well as the consideration which included the reference to $10.00, the reference to $25,000.00, the reference to other good and valuable consideration, as well as the reference to love and affection. Mr. Sprinkle also testified that, since there was no closing date provided for in the deed, in his opinion, title transferred when the seller signed the deed. He stated that it is not uncommon for the consideration to completely pass sometime after the transaction takes place. Mr. Sprinkle testified that, if the deed was signed by both Mr. and Mrs. Doughtie, in his opinion, it was a valid agreement. On cross-examination, Mr. Sprinkle indicated that, in his opinion, the law does require the delivery of the deed, but it was his opinion that delivery took place upon signing.

Mr. Sprinkle's legal secretary, Jennifer Carpenter, also testified. Ms. Carpenter stated that she had been a legal secretary for fourteen years and that she had also been a notary public for fourteen years. She was shown plaintiff's exhibit number one and testified that the date on that deed of November 1, 2002, would have been the first day that she typed the document. Ms. Carpenter compared that document to plaintiff's exhibit number two, the deed dated December 18, 2002, and stated that the two documents were the same except for the date. She stated that December 18, 2002, was the date that she prepared plaintiff's exhibit number two[2] and that she did so because she was asked to do so by Mr. Sprinkle.

Ms. Carpenter testified that on December 18, 2002, she went to the Marlin Road address in the late afternoon while it was still daylight. She stated that an older lady met her at the door and that Mr. and Mrs. Doughtie were also there in the house with a dog. Mrs. Carpenter testified that she was taken to a room where Mrs. Doughtie was laying in bed and that Mr. Doughtie stayed in the room with them while they discussed the document and Mrs. Doughtie signed the document. She stated that Mr. Doughtie left at one point to obtain a tray for Mrs. Doughtie to bear on when signing the deed, but he returned shortly thereafter. Mrs. Carpenter indicated she normally tries to ascertain whether the signatory of the document knows what they are doing and that to the best of her recollection she did that with Mrs. Doughtie. She testified that she did not read the document to Mrs. Doughtie but that she specifically recalled Mrs.

---

[2] Because the original signed version of plaintiffs' exhibit number two was retained by Mr. Doughtie, an unsigned version of that document was presented at trial.

Doughtie saying her name and that she had no reason to believe that Mrs. Doughtie was not in control of her mental faculties.

Ms. Carpenter also testified that she called Mr. Sprinkle to ask whether Mr. Doughtie could hold Mrs. Doughtie's hand because Mr. Doughtie asked Ms. Carpenter if he could help his wife hold the pen to sign the deed. Mrs. Carpenter stated that she had no doubt as to whether or not Mrs. Doughtie understood what she was doing and that she seemed to understand what was taking place. Ms. Carpenter testified that Mr. Doughtie then signed the same document, the deed, right there in the same room after Mrs. Doughtie had done so. Ms. Carpenter then placed the document in a file folder once she had completed the notary clause, and prepared to return to her office.

Ms. Carpenter stated that Mr. Doughtie did not appear to be under duress or having problems understanding what he was doing. Ms. Carpenter stated that Mr. Doughtie did not ask her any questions about the document before he signed it and she had no reason to believe that he did not understand the document. Ms. Carpenter indicated that the questions she asked of Mrs. Doughtie were the same as those asked of Mr. Doughtie and that she specifically remembered obtaining a driver's license from Mr. Doughtie to ascertain his identity. She stated that Mr. Doughtie asked her if he could keep the deed and said he wanted to make sure he had received his money before he released the deed. Ms. Carpenter then called Mr. Sprinkle and Mr. Sprinkle advised her that she could in fact leave the signed deed with Mr. Doughtie, which she did.

On cross-examination, Ms. Carpenter testified that it was clear that Mrs. Doughtie was ill on the day of her visit. Ms. Carpenter did not remember the exact words that Mrs. Doughtie said during the visit, but she did recall that Mrs. Doughtie could hold the pen, though she could not write without some assistance from Mr. Doughtie. Ms. Carpenter testified that she generally describes a document before having it signed, but that she did not specifically recall whether she did so in this instance. Ms. Carpenter stated that she did recall asking Mrs. Doughtie, in substance, if this is what she wanted and Mrs. Doughtie said that it was.

Kathy Bales, the wife of plaintiff Darwin W. Bales, Jr., also testified. She stated that in order to facilitate the transfer of this condominium property, she opened a checking account to be used for the payment of items on the property and that the account was opened in November 2002. Mrs. Bales said there was a leak in the condominium bathroom and she contacted the plumbers to obtain an estimate for repairs to that leak. Mrs. Bales testified that, in anticipation of the purchase of the property, Mr. Doughtie agreed to pay one-half of the repairs and that Mr. Doughtie was present with her during a conversation that

took place in late December 2002 to early January 2003 after Mrs. Doughtie's death at which this arrangement for payment of half of the repairs was agreed upon. Mrs. Bales testified that Mrs. Doughtie's mother, Mrs. Spencer, and Mrs. Doughtie's brother, Mr. Willard Spencer, were paying rent on the property and that, pursuant to the arrangements discussed with her, she understood that she, Mrs. Bales, was to continue to pay rent and the taxes, fees, and other necessary costs out of the rent money that would accumulate in that account.

Mrs. Bales testified that she and the other children wanted to make payment to Mr. Doughtie of $25,000.00 but that they had concerns regarding the title because they had a title search performed and the original deed of trust of the prior owner had never been released. She testified that she did receive a certificate of satisfaction for the old deed of trust. Mrs. Bales testified that, in order to clear up these title issues, she spoke with Mr. Doughtie and obtained from him documents from his original closing file. Mrs. Bales testified that she collected the purchase money from the various children and everyone either provided her with the money or was prepared to write her the check at the time Mr. Doughtie sought to retract his sales offer. Mrs. Bales stated that she had a check from Joann B. Adams dated January 31, 2003, and that she at one time had a check from Anita L. Staton that was received at approximately the same time as Ms. Adams' check. Mrs. Bales testified that she was in the process of obtaining all of that money prior to Mrs. Doughtie's death while, at the same time, they were attempting to clear up the title issues. Mrs. Bales testified that the share for her and her husband was available and they were currently prepared to go forward with the sale.

Mrs. Bales testified that she spoke on several occasions in January 2003 with Mr. Doughtie while he was trying to decide what he wanted to do with his own home and whether he wanted to "downsize." She stated that she talked to him about the paper work necessary for the title company and that she and the other children knew that Mr. Doughtie was getting his papers together to prepare his taxes in March and April 2003. Mrs. Bales stated that she contacted Mr. Doughtie about concluding the transaction during that time frame, March and April 2003, but that he indicated that he did not wish to go forward with the transaction. On cross-examination, Mrs. Bales testified that, in February 2003, she began to collect the checks and did so in anticipation that the title search would come back clear. However, she stated that she never paid any condominium fees or insurance on the property and that, at the time Mr. Doughtie told her, around March/April 2003, that he did not wish to go forward with the transaction, she only had two actual checks in her possession.

The plaintiffs then rested their case, and the defendant moved to strike the plaintiffs' evidence arguing that the Court should not have accepted hearsay testimony as to statements of the mother and that, even with the admissions of such testimony, there was never a valid oral contract. The defense further argued that there was no valid written memorandum to satisfy the Statute of Frauds. The defense, relying upon the case of *Chiles v. Bowyer*, 127 Va. 249, 103 S.E. 619 (1920), argued that a deed cannot serve as a contract in a real estate transaction though it can serve as a memorandum of writing under the Statute of Frauds if there is a preexisting oral contract. Defense counsel also argued, based upon the case of *Mumpower v. Castle*, 128 Va. 1, 104 S.E. 706 (1920), that in order for a deed to constitute an appropriate memorandum of writing under the Statute of Frauds, such deed must contain all the terms of the contract and there must be certainty as to the method and mode of payment. Defense counsel also argued that there was no meeting of the minds because there was no closing date and because no actual money passed hands when the deed was ultimately executed. The Court denied the defense motion to strike.

The defense then presented testimony from defendant, Thomas Doughtie. Mr. Doughtie stated that he was married to Jacqueline Doughtie for twenty years prior to her death in December 2002. Mr. Doughtie confirmed that the condominium unit at issue had been bought in order to provide a home for his wife's mother and in order for them to have it as an investment. He testified that the condominium had been purchased for approximately $46,000.00, with $30,000.00 of that money having been provided by his wife out of monies accumulated from her retirement. He stated that the condominium rent initially paid by Mrs. Spencer was $256.00 a month, though it has now increased to $275.00. Mr. Doughtie indicated that he basically used that rent money to pay the condominium costs and all the other costs, fees, and taxes necessary to maintain the Unit and that, once those were paid, he was left with approximately $30.00 each month.

Mr. Doughtie testified that he never agreed to sell the condominium property to the plaintiffs and that he never agreed to any terms and conditions of a sale. Mr. Doughtie testified that he received no deed prior to December 18, 2002, though he admitted that he spoke to his wife about the condominium and they agreed that he would let her mother stay there until her mother passed away. Mr. Doughtie admitted that Ms. Carpenter came to his house on December 18, 2002, but he was not sure his wife understood what she was signing when the deed was presented to her. He admitted that he obtained a pen and helped his wife hold the pen so that she could sign the deed. When asked whether he understood what he was signing, Mr. Doughtie stated that

"they said it was a deed." Mr. Doughtie also admitted that he was later told that there was a possible problem with the title and that he provided documents to Mrs. Bales so that she could help clarify the title. However, Mr. Doughtie testified that he did not understand that providing those documents was for the purpose of facilitating the sale of the property. Mr. Doughtie testified that, contrary to the testimony of his stepchildren, he did not ever remember asking them for any money to consummate the sale.

Mr. Doughtie further testified that once approximately two months had passed after his wife's death, he did not want to get rid of the piece of property because he began to think that he might want to live there after his mother-in-law passed away. On cross-examination, Mr. Doughtie testified that Mrs. Spencer and her son had lived in Fairwood Homes for approximately fifty years and that he knew his wife wanted a safe place for the two of them to live and that was the reason the condominium was purchased. Mr. Doughtie testified that Mrs. Spencer's son, Willard Spencer, is capable of fixing some of his meals and that he in fact had a driver's license. However, Mr. Doughtie questioned his competency to live in the house by himself should Mrs. Spencer pass away and Mr. Doughtie stated that he did not expect Mr. Spencer to live in the condominium after Mrs. Spencer passed away.

Mr. Doughtie admitted that he was present during the summer of 2002 when a conversation took place between Mrs. Doughtie and at least one of her children regarding the transfer of the ownership of the condominium to the children. Mr. Doughtie stated that he did not speak up during that conversation and object to the transfer of the property. He further testified that he had no memory of any discussion of a $50,000.00 value of the property. Mr. Doughtie testified that he did not remember which of the children was present at the home when this property transaction was discussed with his wife, and he said that he did not speak up because he did not want to upset Mrs. Doughtie. Mr. Doughtie testified that on December 18, 2002, he was in the home with Mrs. Doughtie and her friend, Margaret, when Ms. Carpenter brought the "paper" in and his wife was having difficulty signing the paper. He stated that he picked up her hand, put the pen in her hand, and helped her sign the document. During cross-examination, Mr. Doughtie testified that he would have done anything his wife wanted him to do that evening because she was quite ill. Mr. Doughtie admitted that Ms. Carpenter told him he had signed a deed and he stated that he knew it was for the condominium unit and he assumed it was still for the benefit of his stepchildren. However, Mr. Doughtie testified that he was not going to let the deed leave his home until the money had been paid to him. He stated that he later changed his mind about the sale of the property. When asked whether the condominium was to

be purchased so that Mrs. Spencer and her son could continue to live in the property, he stated as follows: "that's what we had said they could have it for." Mr. Doughtie later said that such discussion as to the use of the property probably took place after his wife's death. Mr. Doughtie stated that he told the children that he did not want to go forward with the sale of the property.

At the conclusion of Mr. Doughtie's testimony, the defense rested and renewed its motion to strike. The Court listened to the argument on the motion to strike and closing arguments in the matter and advised the parties that the case would be taken under advisement while an Opinion and Order was prepared.

### III. *Discussion*

There are numerous issues presented by the facts stated above. Each of these issues is addressed individually below in order to determine whether the plaintiffs are entitled to the requested specific performance on the contract alleged.

### A. *Specific Performance*

The plaintiffs seek specific performance of a contract, asserting that such equitable relief is appropriate because remedies at law, such as damages, are inadequate. *Thompson v. Commonwealth*, 197 Va. 208, 212-13, 89 S.E.2d 64, 67 (1955). Such suits for specific performance of contracts relating to land are appropriately addressed to the discretion of a court sitting in equity because of the unique nature of such a contract. W. Hamilton Bryson, *Virginia Civil Procedure* 73 (3rd ed. 1997); *see Bond v. Crawford*, 193 Va. 437, 444, 69 S.E.2d 470, 475 (1952). In such a contractual relationship, the Court may grant specific performance in equity if: (1) there is a valid contract between the parties that is itself not inequitable, (2) specific performance is a practical form of relief in the circumstances, (3) there are mutual performance obligations, such that each party may comply with obligations under the contract, and (4) there are no legal or equitable defenses to enforcement of the agreement. Kent Sinclair and Leigh B. Middleditch, Jr., *Virginia Civil Procedure* § 3.4[B] (Fourth ed. 2003); *City of Manassas v. Board of County Supervisors of Prince William County*, 250 Va. 126, 458 S.E.2d 568 (1995).

The condominium at issue is currently occupied by family members of the plaintiffs, and their presence and need for an appropriate home was a significant fact underlying the agreement plaintiffs allege. Therefore, this condominium, occupied by two elderly individuals, is particularly "unique and cannot be duplicated by a purchase on the open market with the money damages received at common law for the breach of the contract." Bryson,

*supra* 73. There is little question that specific performance is a practical form of relief *if* the Court determines that the defendant breached a valid agreement that was appropriately memorialized in a written memorandum satisfying the Statute of Frauds. Accordingly, we turn our attention to these questions.

## B. *Existence of Oral Contract*

While there is no legal requirement that a contract precede a conveyance of real estate, the plaintiffs contend there was an oral contract for the conveyance of the defendant's interest in the condominium property.[3] Therefore, the first issue for decision is whether there was an oral agreement for the sale of Mr. Doughtie's interest in the condominium in exchange for payment of $25,000.00. While a deed was executed by Mr. Doughtie, a contract for the sale of land is different from a deed which actually transfers title to such property. Though a contract of sale and purchase contemplates a subsequent execution of a deed transferring title, 77 Am. Jur. 2d, *Vendor and Purchaser*, § 1 (1975), a contract of sale must still exist. The formation of a valid and binding contract for the sale of land is governed by the general rules of law controlling the formation of contracts in the Commonwealth of Virginia. *Id.* at § 4. The proponent of an oral contract has the burden of proving all the elements of a valid and enforceable contract. *See Richardson v. Richardson*, 10 Va. App. 391, 396, 392 S.E.2d 688, 690 (1990), *rev'd on other grounds*, 263 Va. 20, 23, 556 S.E.2d 767, 768 (2002). The essential elements of a contract are offer and acceptance, with valuable consideration. *See Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980); *see* Stoebuck & Whitman, *Law of Property*, § 10.1 (3rd ed. West 2000) (noting that real estate contracts are subject to the same legal rules governing other contracts). A contract is an agreement, for consideration, between two or more parties, and such a contract arises when an offer is made and accepted. *Id.*

---

[3] Gifts of real estate rarely involve contracts since no consideration is to be paid by the recipient. Therefore, Mrs. Doughtie's interest in the condominium property is not the subject of contract analysis. William B. Stoebuck, Dale A. Whitman, *The Law of Property*, § 10.1 (3rd Ed. West. 2000). According to Mr. Doughtie's testimony, Mrs. Doughtie signed the deed presented to her on December 18, 2002. Furthermore, Mr. and Mrs. Doughtie gave the deed to Ms. Carpenter after signing it, and there is no testimony suggesting Mrs. Doughtie had any reason to expect that her interest in the property would not be gifted consistent with her signature and delivery of the deed to Ms. Carpenter. There is no indication that Mrs. Doughtie was aware that Mr. Doughtie later asked Ms. Carpenter to return the deed to him pending receipt of payment. Accordingly, Mrs. Doughtie's interest in the condominium property was gifted to the plaintiffs by the deed, as further discussed below.

It should be easy to review applicable case law and determine somewhat precisely what matter must be agreed to by the parties in order to have an enforceable real estate sales contract. However, it is quite difficult to determine precisely what those elements are because of the Statute of Frauds. The statute, as discussed below, "requires a writing for the enforceability of a contract, and a large number of cases deal with the elements which the writing must contain." Unfortunately, it "is usually impossible to determine whether a court is enumerating the essential ingredients of the agreement itself (under the common law of contracts) or the necessary elements of the writing (as a matter of judicial interpretation of the statute of frauds)." Accordingly, the two sets of elements have come to be seen as indistinguishable as a matter of principle. Stoebuck & Whitman, *The Law of Property*, § 10.1. Nevertheless, this Court will attempt to distinguish between the elements of the contract and the elements of the written memorandum.

Under the objective theory of contract, which controls in Virginia, an offer has been made if a reasonable person in the offeree's position, in view of the offeror's acts and words and the surrounding circumstances, would believe that the offeror has invited the offeree's acceptance. *Chang v. First Colonial Savings Bank*, 242 Va. 388, 391-92, 410 S.E.2d 928, 931 (1991); *Richmond Eng'g Corp. v. Loth*, 135 Va. 110, 139-53, 115 S.E. 774, 782-86 (1923); *see also* Va. Model Jury Instruction No. 45.040 (LexisNexis 2003). An acceptance is an unconditional promise to be bound by the terms of the offer. *Richmond Eng'g Corp.*, 135 Va. at 151-52, 115 S.E. at 786. Such acceptance may be by conduct rather than words. *Id.* at 152, 115 S.E. at 786. The modern test for determining whether there was acceptance (reflecting the objective theory of contract) is whether it would be clear to a reasonable person in the position of the offeror that there was an acceptance. *See Green's Ex'rs v. Smith*, 146 Va. 442, 452-55, 131 S.E. 846, 848-49 (1926). The consideration is that which is given in exchange for the agreement. Consideration is, in effect, the price bargained for and paid for the agreement or promise. *See Montagna*, 221 Va. at 346, 269 S.E.2d at 844, *see also* Virginia Model Jury Instruction No. 45.040 (LexisNexis 2003).

In order to sustain a bill for specific performance of an oral contract of purchase, the evidence must be clear, full, and free from suspicion and the evidence must disclose the price to be paid since a price is an essential element of the contract.[4] *Taylor v. Hopkins*, 196 Va. 571, 575, 84 S.E.2d 430, 432 (1954). When an offer is made without any limits on the time for

---

[4] The Court notes that in some jurisdictions, if the parties do not agree on a price, no mention of the fact need be made in the writing and a court will assume that a reasonable price was to be paid. 3 Am. L. Prop. § 11.5, note 25 (1952).

acceptance, it must be accepted within a reasonable time or it is presumed to be withdrawn. *Crews v. Sullivan*, 133 Va. 478, 483, 113 S.E. 865, 867 (1922). The purpose of this rule is to protect the offeror against results that he does not expect or reasonably foresee. *See* Virginia Model Jury Instruction No. 45.060. However, the offeror's conduct may lead an offeree to consider the offer open at a time that would otherwise be unreasonable. 1 A. Corbin, *Corbin on Contracts* § 35 (1963).

With these basic principles of contract formation in mind, we must compare the facts before the Court with the requirements for the existence of a contract. In the present case, the defendant contends that there was no contract because there was no meeting of the minds. It is clear that in order to consummate a binding contract for the sale of land there must be a meeting of the minds of the parties. *Marefield Meadows, Inc. v. Lorenz*, 245 Va. 255, 260, 427 S.E.2d 363, 365 (1993). However, while there must be a meeting of the minds, the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. *Id*. Therefore, in order to determine whether there was a meeting of the minds, we will first consider whether there was an offer.

### 1. *Offer*

As to the question of whether there was a valid offer, the defendant contends that he never made a specific offer to sell the condominium. As noted above, the question is whether a reasonable person would have objectively believed an offer was made, not whether the offeror subjectively actually intended to make an offer. This is a critical distinction in this case in light of the defendant's admission that he was present during discussions between his wife and her children regarding the sale and purchase of his property interest and that he remained silent during such discussions. As then U.S. District Judge Learned Hand once said in describing the difference between subjective intentions and objective belief in the context of objective contract theory:

A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. . . .

Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and no characterization of its effects by either party thereafter, however truthful, is material.

*Hotchkiss v. National City Bank of N.Y.*, 200 F. 287, 293-94 (S.D. N.Y. 1911).

Ms. Adams testified that her mother, in the presence of Mr. Doughtie, asked her to make arrangements with her siblings to purchase Mr. Doughtie's interest in the condominium, at $6,250 per person and that she discussed their progress in obtaining such funds with Mr. Doughtie on several occasions. Ms. Smith testified that she also had a similar conversation with her mother, in the presence of Mr. Doughtie. Ms. Smith stated that her mother told her during that conversation, with Mr. Doughtie present, that it was his idea that the four children purchase his interest in the condominium. She also testified that Mr. Doughtie approached her several times prior to her mother's death to ask if she and her siblings had the funds to complete the purchase. Ms. Staton testified that she also had a conversation with her mother about the purchase of the condominium. Ms. Staton indicated that, at one point prior to her mother's death, she was visiting with Mr. and Mrs. Doughtie at their home when she specifically discussed with Mr. Doughtie the method by which he and her mother had arrived at the $25,000 purchase price for his interest. Finally, Mr. Bales testified that his mother, in the presence of Mr. Doughtie, asked that he also participate with his siblings in agreeing to purchase Mr. Doughtie's interest in the condominium and that such interest would be half of $50,000.

Mr. Doughtie also testified that he was present during conversations between his wife and at least one of the plaintiffs regarding the transfer of ownership of the condominium to the children. Mr. Doughtie also admitted that he did not speak up or object during those discussions, but remained silent during such discussions. Later, Mr. Doughtie also admitted that he and his wife "had said they [the children] could have it for" Mrs. Spencer and her son to continue living there after Mrs. Doughtie's death.

Viewing these words and actions objectively, it is clear that a reasonable person would have believed an offer had been made by Mr. Doughtie for the children to purchase his interest in the condominium in exchange for $25,000. While Mr. Doughtie does not recall all of the conversations about which plaintiffs testified, this Court finds that such conversations and actions took place in the manner described by plaintiffs. Assuming that the testimony regarding these words and actions is admissible (which is addressed below),

this Court finds that a reasonable person, based upon such words and actions, would have believed that a valid offer of sale was made. However, Mr. Doughtie contends that the Court should not have accepted the "hearsay" testimony of the plaintiffs regarding conversations between themselves and Mrs. Doughtie and that the Court similarly should not have accepted "hearsay" testimony of the plaintiffs regarding his presence and actions, or lack thereof. The defendant's admissions during the trial, in and of themselves, are sufficient for a finding that he made an offer, through his words and deeds, for the children to purchase his interest in the condominium for payment of $25,000. Accordingly, the Court will address defendant's contention.

### a. Hearsay

The Virginia courts have recognized that "hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." *Taylor v. Commonwealth*, 28 Va. App. 1, 9, 502 S.E.2d 113, 117 (1998). The justifications for the rule are numerous but can best be viewed as objections based upon the lack of reliability and trustworthiness of such out-of-court statements. Charles E. Friend, *The Law of Evidence in Virginia* § 18-2 (6th ed. 2003). In response to criticism of the rule, numerous exceptions have developed. Among those exceptions is the party admission exception. As Professor Friend notes, "any statement made by a party to the litigation ... is admissible against that party as a party admission." *Id.* at § 18-38; *Tyree v. Lariew*, 208 Va. 382, 385, 158 S.E.2d 140, 143 (1967). Such admissions are admitted because the person who made the admission is a party to the action who may take the witness stand and deny or explain the admission. *King v. Commonwealth*, 18 Va. App. 57, 59, 441 S.E.2d 704, 705 (1994). The fact finder can then weigh the credibility of the witnesses, having the benefit of the denial or explanation by the party.

Silence alone may also constitute a party admission. As the Virginia Supreme Court said in *Sanders v. Newsome*, 179 Va. 582, 592, 19 S.E.2d 883, 887 (1942), "[a] declaration in the presence of a party to a cause becomes evidence, as showing that the party, on hearing such a statement, did not deny its truth; for, if he is silent when he ought to have denied, there is a presumption of his acquiescence." As Professor Friend notes in his treatise, the test for admissibility of an admission by silence is "whether [persons] similarly situated would have felt themselves called upon to deny the

statements affecting them." *Weinbender v. Commonwealth*, 12 Va. App. 323, 325, 398 S.E.2d 106, 107 (1990); Friend, *supra*, § 18-49; *see Rutledge v. Hoffman*, 81 Ohio App. 85, 86-87, 49 Ohio Law Abs. 129, 75 N.E.2d 608, 609 (1947) (noting intent to enter into oral contract may be disclosed by silence and circumstantial evidence); *see Straatmann v. Straatmann*, 809 S.W.2d 95, 99 (Mo. App. 1991) (noting acquiescence of wife in husband's actions in oral contract context); *see also Wootchie v. Neavin*, 1974 Ohio App. LEXIS 2896 *4 (1974) (noting silence and acquiescence of wife in husband's actions in oral contract context). However, in order to determine whether such silence is admissible as an admission, several factors must be considered: (1) the statement must have been heard by the person who is claimed to have acquiesced to it, *Baughan v. Commonwealth*, 206 Va. 28, 32, 141 S.E.2d 750, 753 (1965), (2) the statement must have been understood by the person, (3) the subject matter of the statement must have been within the person's knowledge, (4) there must be no physical or emotional impediments to deter the person from responding, (5) the personal makeup of the speaker, age, relationship to others involved, etc., may make it unreasonable to expect a denial, and (6) probably most important of all, the statement must be such as would, if untrue, call for a denial under the circumstances. *Weinbender*, 12 Va. App. at 325-26, 398 S.E.2d at 107-08.

Applying these factors to the evidence in this case, as noted in part above, this Court finds that Mr. Doughtie was present during the various conversations described by the children. Mr. Doughtie himself admitted that he was present during at least one of these conversations. This Court also finds that Mr. Doughtie understood the statements that were made in his presence. Not only did the plaintiffs testify that he was present in the kitchen during the conversations, but Mr. Doughtie confirmed his understanding as to the reason that the property purchase and gift was taking place. The Court also finds that the subject matter was within Mr. Doughtie's knowledge since he testified that he and Mrs. Doughtie purchased the condominium as a place for her mother to live and that he and his wife had discussed her desire for her mother to continue living there after Mrs. Doughtie's death. Accordingly, Mr. Doughtie was clearly familiar with the foundation for the discussions that were taking place in his presence.

Mr. Doughtie testified that he did not speak up during the contract discussions in his kitchen because he did not want to upset his wife. The question, then, becomes whether such concerns are of a sufficient nature so as to prevent the admissibility of the admission by silence. In *Weinbender*, the party against whom the admission by silence was offered was a driver of a vehicle that had been involved in an accident after consuming alcohol. The

Court of Appeals found that the driver's silence in the face of statements made in her presence, when coupled with her explanation of her version of the accident during the same time frame as the silence, was enough for the court to have found there were no physical or emotional impediments to her speaking up. *Weinbender*, 12 Va. App. at 326, 398 S.E.2d at 108. In this case, there is absolutely no contention that the defendant was physically incapable of speaking up. Nor is there any contention that he was emotionally incapable of speaking up. No one has suggested that the defendant had an emotional breakdown at the time or that he was under a mental disability. The Court does not underestimate the concern that the defendant must have felt for his wife during her illness, but to disallow the admissibility of his admission by silence would be tantamount to countenancing his actions which, giving him the benefit of the doubt, unintentionally misled his step-children. Accordingly, this Court finds that there was no emotional impediment in the summer of 2002 sufficient to preclude the admissibility of this evidence of Mr. Doughtie's silence while the offer of sale and acceptance were discussed.

As for factor number five, requiring consideration of the defendant's personal makeup, the Court finds that Mr. Doughtie's relationship to the speaker, his wife, and his step-children of twenty years is sufficient that he should have been able to express any reservations he may have had. In fact, the defendant's own testimony was that he changed his mind about the sale of the property to the children. Therefore, it was reasonable for the children to have expected a denial from Mr. Doughtie as to the contract offer statements made by their mother in his presence, as well as their acceptance of such offer. The Court also finds that the statement made by Mr. Doughtie's wife was clearly of such a nature as would, if untrue, call for a denial under the circumstances. The defendant should have realized that if the $25,000 had been presented to him prior to his wife's death, an event no one has suggested was foregone as of the offers in the summer of 2002, then his wife would have been just as upset with him, if not more, than if he spoke up when the original conversation(s) took place. Accordingly, the Court finds that these factors militate in favor of admitting the party admission by silence. Mr. Doughtie, by his silence, adopted the statements of his wife and created a belief in the minds of his step-children that he was offering to sell his interest in the condominium to them for $25,000.

The Court further notes that the Supreme Court of Virginia has also recognized the admissibility of such statements in the spousal context as a form of adoptive admission. In *Coppola v. Commonwealth*, 220 Va. 243, 251, 257 S.E.2d 797, 803 (1979), the Court stated that "we approve the rule that where the wife's extrajudicial statements are made with the actual or

constructive knowledge and with the express or tacit consent of the husband, they are admissible in evidence against him." In *Coppola*, the Court admitted statements of the criminal defendant's accomplice, Ms. Mills, as to what the defendant's wife told her that he had said as they proceeded to the location where they were going to conduct the crime. In the same way that Mills testified to what the defendant's wife told Mills in the defendant's presence, the children in this case testified as to what Mrs. Doughtie said in the presence of Mr. Doughtie. Therefore, both Mrs. Doughtie's statements and Mr. Doughtie's silence are admissible.

### b. *Time for Payment*

The defendant also contends that there was no valid offer because nothing was said as to the time within which the money would be paid and that this constituted a fatal flaw preventing mutuality. During the trial of this matter both parties stipulated to the expertise of Wayne Sprinkle, Esq., in the field of real estate law and transactions.[5] Mr. Sprinkle testified that in his opinion, payment terms are not a necessary element for the formation of such a real estate contract, though it is common for such terms to be included in a contract. The Court accepts this testimony because it is a fair statement of the law. If nothing is said in such a contract as to the time when the purchase money is to be paid, the law implies that payment is to be made on demand within a reasonable time. *Crews*, 133 Va. at 484, 113 S.E. at 867. What constitutes a reasonable time depends on the situation of the parties, the nature of the transaction, and the facts of the particular case. *United States v. 2974.49 Acres of Land*, 308 F.2d 641, 643 (4th Cir. 1962); *see Grossmann v. Saunders*, 237 Va. 113, 120-21, 376 S.E.2d 66, 70 (1989).

In the present case, no witness suggested that time was of the essence. In fact, all of the testimony has indicated that the nature of the transaction did not make time of the essence. The intent was clear; Mrs. Doughtie and the plaintiffs wanted to assure that Mrs. Doughtie's mother and brother had a secure place to live after Mrs. Doughtie's death. This Court finds that Mr. Doughtie either acquiesced in this arrangement or specifically agreed to the arrangement. In either case, it is clear that the timing of the transaction was driven by Mrs. Doughtie's health considerations. Therefore, the absence of a specified time for payment is not unusual. That being the case, the question

---

[5] The Court finds Mr. Sprinkle to be an expert in the field of real estate transaction and the law attending such transactions in the Commonwealth of Virginia and also finds that his specialized knowledge will assist the Court, as the trier of fact, to determine facts in issue. Va. Code § 8.01-401.3.

becomes whether February/March 2003, when payment was suggested by plaintiffs, was a reasonable time within which to complete the transaction. Mr. Doughtie testified that his intention, regardless of this litigation, was for Mrs. Spencer to remain in the condominium during her lifetime, assuming she was able to remain there. Therefore, from his standpoint, time was not of the essence. What became clear during Mr. Doughtie's testimony was that he simply changed his mind regarding the agreement, and the Court so finds. The issue was not that too much time had passed compared to what he expected at the time he entered into the agreement. The Court does not suggest that it would be reasonable for the children to expect to make payment in February/March 2004 just because Mrs. Spencer might still live in the condominium at that time. However, in the circumstances of this case, where there were ongoing discussions with Mr. Doughtie about the plaintiff's efforts to obtain their funds, there was a brief period since the death of Mrs. Doughtie, there were discussions between plaintiffs and Mr. Doughtie about obtaining a release of the prior deed of trust, and there were discussions about seeking to complete the purchase before Mr. Doughtie had to file his taxes, the timing of the plaintiffs' tender of payment was not unreasonable.

### 2. Acceptance

An offer to sell land imposes no obligation upon either party until it is accepted by the party to whom such offer is made, though the offer to sell may be withdrawn at any time prior to its acceptance. 77 Am. Jur. 2d, *Vendor and Purchaser*, § 15 (1975). Where an offer to sell land is accepted unconditionally, prior to its withdrawal, there arises a valid executory contract of sale. *Id.* The burden of proof that an offer has been timely accepted rests upon the party claiming to have accepted an offer. 77 Am. Jur. 2d, *Vendor and Purchaser*, § 15 (1975). A purported acceptance of an offer to sell land departs from the terms of the offer and prevents the formation of a contract of sale when such purported acceptance includes a condition that the title be satisfactory. 77 Am. Jur. 2d, *Vendor and Purchaser*, § 18 (1975). However, an agreement in general terms to convey real estate, without specifying the nature of the title held by the seller or the kind of deed which is to be given, calls for a conveyance of the entire interest in the land sold, by a good and sufficient deed. "In other words, an agreement to sell at a sound price, without reservation or exception, implies that a marketable title free of encumbrances will be passed to the purchaser upon compliance with his obligations." 77 Am. Jur. 2d, *Vendor and Purchaser*, § 19 (1975). Accordingly, if an acceptance is made conditional upon title being "good, it is generally considered to be

effective since this condition is one which the law impliedly attaches to the offer of sale." *Id.*

The facts before this Court show that each of the children accepted the offer of Mr. Doughtie to convey his interest in the condominium property. Each of the plaintiffs testified to such acceptance. Mr. Doughtie haltingly admitted there was such an agreement. While there was some discussion, after the contract was formed, regarding the need to address a prior mortgage that had not been released, this amounted to no more than a recognition that the title needed to be good title. Mr. Doughtie apparently interpreted the discussions regarding this issue as nothing more than a desire to have the prior mortgage released, not as a new term being proposed in an acceptance. As was recognized in 77 Am. Jur. 2d, *Vendor and Purchaser*, § 19 (1975), "an offeree, in making a positive acceptance of an offer, may make a request or suggestion that some modification or change affecting the title be made. So long as it clearly appears that he intends to accept the offer regardless of whether or not his request is granted, such additional language will not preclude the formation of the contract." *See Karas v. Brogan*, 55 Ohio St. 2d 128, 129, 378 N.E.2d 470, 471 (1978). In the facts before this Court, the plaintiffs discovered that a prior deed of trust on the property (apparently from its previous owner) was never released. Mrs. Bales testified that the plaintiffs ultimately received a certificate of satisfaction for the old deed of trust. Since this issue did not arise until after the contract was formed, it clearly was not a new term proposed in the acceptance. The fact that the plaintiffs themselves took the initiative, discovered the fact that the prior deed of trust had never been released, and obtained the certificate of satisfaction themselves is a further indication of the fact that they understood a contract to exist. Accordingly, this Court finds that the plaintiffs accepted Mr. Doughtie's offer to sell his interest in the condominium property for $25,000.00.

### 3. Consideration

In order for a land sale contract to be binding, it must be based on sufficient consideration. 77 Am. Jur. 2d, *Vendor and Purchaser*, § 23 (1975). Furthermore:

> the consideration essential to the validity of an agreement for the purchase or sale of land need not be paid at the time of the making of the agreement. Subject to some qualification, it is a general rule that a promise by one party is a sufficient consideration for a promise by the other party to an agreement. If, therefore, there is a promise on the part of the purchaser to buy and pay the consideration, this itself is a

sufficient consideration for the promise of the vendor to sell and convey, and vice versa, and where an offer to buy or sell is duly made, its due acceptance creates the mutuality necessary to a complete contract.

77 Am. Jur. 2d, *Vendor and Purchaser*, § 25 (1975); *Price v. Taylor*, 251 Va. 82, 85, 466 S.E.2d 87, 88 (1996) (noting that "mutual promises in a contract constitute valuable consideration"); *Walker v. Government Employees Ins. Co.*, 12 Va. Cir. 436, 439 (Arlington County 1974) (Judge Duff noting that "the promise by one party constitutes good consideration for the promise by the other"). The agreement described by the plaintiffs, and essentially acknowledged by the defendant, provided that the defendant promised to convey his interest in the condominium property in exchange for plaintiffs' promise to pay him $25,000.00, such money to be paid within a reasonable time since no other provisions regarding time were made a part of the agreement. The Court has found these to be the facts, and the Court further finds that these mutual promises constituted adequate consideration and the agreement is therefore binding as to the plaintiffs and the defendant.

## C. *Enforcement of Agreement and the Statute of Frauds*

Even before the enactment of the 1677 English Statute of Frauds, Stat. 29 Car. II, c. 3, the courts of equity required the existence of a writing before granting specific performance of a real estate contract. Stoebuck & Whitman, *Law of Property* § 10.1 (2000). The Statute of Frauds is the codification of the requirement for such a writing, and every state in the United States of America has such a statute. *Id.* The purpose of the writing requirement was to prevent fraud being perpetrated by someone claiming to have entered into a land sale contract that was in fact fictitious or which differed in its terms from those claimed. *Id.* Therefore, the statute seeks to "make difficult the task of those who might lie about the contract or attempt to produce forged written evidence of its existence or terms." *Id.; Lindsay v. McEnearney Assocs.*, 260 Va. 48, 53, 531 S.E.2d 573, 575 (2000) (applying the Virginia statute codified at Va. Code § 11-2). Virginia's codification of the Statute of Frauds does not outlaw or vitiate the underlying agreement. Its effect is only procedural, barring an action on the contract unless it is evidenced by a writing signed by the party to be charged or his agent. *Hewitt v. Hutter*, 574 F.2d 182, 188 (4th Cir. 1977). The statute provides, in pertinent part, that "unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action shall be brought in any of the following cases ... upon any contract

for the sale of real estate, or for the lease thereof for more than a year. ... The consideration need not be set forth or expressed in the writing, and it may be proved (where a consideration is necessary) by other evidence." Va. Code § 11-2.

In most cases, the real estate contract itself will be in writing. Where, as here, the contract is not in writing, there must be a memorandum of the parties' agreement in compliance with the Statute of Frauds, specifying certain required terms. However, the memorandum need not recite every term of the oral contract. *See Browder v. Mitchell*, 187 Va. 781, 785, 48 S.E.2d 221, 223-24 (1948). As the *Browder* Court noted, "it is the oral contract which is enforced, but it can be enforced only when the statute has been satisfied." *Id.* That Court also recognized that "except as evidence of the oral contract, the memorandum has no force or effect, unless and until the oral contract has been established by a preponderance of evidence. Then, if accurate and complete, it prevents the interposition of the statute of frauds as a bar to the enforcement of the oral contract." *Id.*

It is generally recognized that the memorandum, in order to satisfy the statute of frauds, must contain: (1) the name of each party to the contract, (2) a description of the land to be conveyed, and (3) the essential terms and conditions. *Reynolds v. Dixon*, 187 Va. 101, 108, 46 S.E.2d 6, 9 (1948); 3 A. J. Casner, *American Law of Property* 20 (Little, Brown 1952, 1976 Supp.); Stoebuck & Whitman, *supra*, § 10.1. Even where parties to an oral contract agree on the time of performance, courts typically take the view that time of performance is sufficiently minor or nonessential that its absence from the written memorandum is not fatal. Stoebuck & Whitman, *supra*, § 10.1; *Powell on Real Property*, § 81.02[1][d][iv] (noting that, where time is missing, a reasonable time of performance is implied); *see Breen v. Phelps*, 186 Conn. 86, 439 A.2d 1066 (1982).

### 1. *Deed as Memorandum*

The plaintiffs contend that the deed signed by Mr. Doughtie (and Mrs. Doughtie) satisfies the Virginia Statute of Frauds. The defendant disagrees. The Virginia Supreme Court recognized, in *Boston v. De Jarnette*, 153 Va. 591, 600, 151 S.E. 146, 148 (1930), that given the appropriate facts, a deed can be "sufficient as a memorandum in writing to meet the requirements of the statute." This view was later confirmed by the Court in *Reynolds v. Dixon*, 187 Va. 101, 107, 46 S.E.2d 6, 8-9 (1948), where the Court noted that the purpose to be served by the Statute of Frauds does not require any particular form of writing, but "may consist of any kind of writing, from a solemn deed

down to mere hasty notes or memorandum in books or papers." The *Reynolds* Court also noted that the overriding intent of the statute is to prevent contract claims from being manufactured out of whole cloth, and as such "[a] written recognition of the contract, expressed in one instrument or, in a proper case, in several writings, may constitute a sufficient memorandum. . . ." *Id. (cited in Questor Realty, Inc. v. Rucker Realtors*, 25 Va. Cir. 118 (Fairfax County 1991)). The view that a deed, prepared pursuant to an oral contract, may suffice to satisfy the statute of frauds is accepted in other jurisdictions as well. *See Carolina Builders Corp. v. Howard-Veasey Homes, Inc.*, 72 N.C. App. 224, 231, 324 S.E.2d 626, 631 (1985); Stoebuck & Whitman, *supra*, § 10.1.

It is of no moment that the deed was not signed by plaintiffs, since the Virginia Supreme Court recognized in *Central Land Co. v. Johnston*, 95 Va. 223, 28 S.E. 175 (1897), that by filing a Bill of Complaint for specific performance, a party who had not signed a memorandum of contract thereby affirmed the contract and it became enforceable in equity. *See also Walker v. Henderson*, 151 Va. 913, 931, 145 S.E. 311, 316 (1928); W. Hamilton Bryson, *supra*, 76. Therefore, this Court concludes that a deed may be sufficient as a memorandum meeting the requirements of the Virginia Statute of Frauds.

It is not necessary that the original signed deed be introduced in evidence if it is unavailable. The deed's contents may be proved by parol or other evidence. *See Reed v. Hess*, 239 Kan. 46, 716 P.2d 555 (1986); Stoebuck & Whitman, *supra*, § 10.1. Therefore, the testimony in this case confirms the existence of the signed deed as well as its contents and introduction of the original signed deed, presumably in Mr. Doughtie's possession, is not necessary for the plaintiffs to prevail.

Since a deed may suffice, the question is whether the deed in this case contained the essential elements required of a written memorandum. Turning to the specifics of the deed before the Court as plaintiffs' Exhibit number two, the Court finds that this deed, which is identical to the one signed by Mr. and Mrs. Doughtie, though without their signatures, contains the names of both Mr. and Mrs. Doughtie as well as the names of the four plaintiffs in this suit, constituting all the parties to the agreement. The Court also finds that the deed contains a thorough description of the land to be conveyed. The deed also contains the consideration and price, indicating $25,000.00 and reciting "love and affection" as a further basis for the conveyance.[6] While the deed contains

---

[6] Where a price is agreed upon in an underlying oral agreement, which this Court finds to be the case, then the cases are divided as to whether the writing required by the Statute of Frauds must include such price. Stoebuck & Whitman, *supra*, § 10.1. Even though the Virginia Statute of Frauds provides that consideration is not an essential term of a written

no time for performance, as noted above, the time for performance is not an essential term of the contract and therefore it need not be contained in the written memorandum in order to satisfy the Statute of Frauds. The law implies this missing term and sets a reasonable time for performance, which this Court finds to be the case on these facts. Therefore, the deed executed by Mr. Doughtie contained all of the required elements and essential terms of the agreement and is therefore a written memorandum satisfying the Virginia Statute of Frauds.

### 2. *Delivery of Memorandum/Deed*

The defendant contends that the deed cannot serve as a valid memorandum because it was never delivered. The plaintiffs disagree with this contention. The Virginia Supreme Court recognized, in *Boston*, 153 Va. at 600, 151 S.E. at 148 (1930), that "where … an undelivered deed expresses the terms of a previous verbal contract between the parties, such a deed is sufficient to take the contract out of the statute [of frauds], and may properly be made the basis of specific performance," *citing Chiles v. Bowyer*, 127 Va. 249, 259-60, 103 S.E. 619, 622 (1920), for that proposition. The *Boston* Court noted that, "while a purchaser … cannot be compelled to take a defective title, but has a right to insist upon a clear legal title, on the other hand, though the vendor cannot make the title he contracts to make, yet he may be compelled to convey such title as he has, and to compensate for the defect; nor does it lie for him to object for the want of a complete title in him." *Id.* at 602, 151 S.E. at 149.

Prior to the 1930 decision in *Boston*, the Virginia Supreme Court considered the facts necessary to support the argument that an undelivered deed was effective as a memorandum. In *Mumpower v. Castle*, 128 Va. 1, 104 S.E. 706 (1920), the plaintiffs were the children of Mrs. Castle and her second husband, Mr. Castle. The defendants were the children of Mrs. Castle and her first husband. The evidence showed that, during Mrs. Castle's second marriage, she and Mr. Castle agreed that certain land would pass to Mrs. Castle and the Mumpower children upon Mr. Castle's death. This agreement apparently took place some thirty years prior to the testimony in the case. The evidence also showed that the ownership of the land was recorded solely in the name of Mr. Castle and that, when Mrs. Castle subsequently learned the land had been conveyed to Mr. Castle rather than to herself and the Mumpower children, she expressed her displeasure. While Mr. Castle subsequently

---

memorandum, "consideration" and "price" are two different things. *Id.* This Court does find that price was an essential element of the oral agreement and further finds that, since such price was agreed upon, it must be found in the written memorandum, as it was. *Id.* at note 33.

executed a deed of the land to her, she declined to accept such deed and the matter remained that way until Mr. Castle's death. Upon his death in 1899, Mr. Castle's brother discovered in Mr. Castle's private papers an executed deed dated 1894 conveying the land to Mrs. Castle. Mrs. Castle did not previously know her husband had made the deed. The following day, she had the deed recorded and began exclusive possession of the property until her death in 1916. The evidence showed that the only consideration for the deed was the interest of Mrs. Castle and the Mumpower children in the personal property that was used in paying for the land when it was originally purchased by Mr. Castle.

The *Mumpower* Court addressed two questions relevant to the issues facing this Court. First, the Court held that there was no valid delivery of the 1894 deed so as to make it effectual and operative as a deed of conveyance of the land purported to be conveyed by such deed. In reaching this conclusion, the Court stated that it found no evidence of delivery and referenced several facts. Among those facts was Mr. Castle's failure to disclose to Mrs. Castle or to any one of the beneficiaries, during his lifetime, that he had executed the deed. The Court also noted that Mr. Castle made no declaration that he intended to convey the land. Therefore, the Court concluded that it was not the intention of Mr. Castle that the deed should be delivered and become operative as a conveyance in his lifetime. The Court also stated that the "evidence negatives the conclusion that the signing, sealing, and acknowledgment of the deed by the grantor were intended by him to complete the transaction insofar as he was concerned, so as to make the deed operative *inter vivos.*" *Id.* at 11, 104 S.E. at 709. Concluding its review of this question, the Court stated that the deed "was supported by a valuable consideration and we would give it effect as a contract to convey if we could do so in accordance with principle and what we consider the correct view taken by the authorities. But on this subject, the authorities hold that such effect is given to an undelivered deed only where there is some evidence *aliunde*[7] that there was a meeting of the minds of the grantor and grantee in a completed contract, the terms of which are expressed in the deed. . . ." *Id.* at 18, 104 S.E. at 711.

Addressing this question in the context of our case, this Court notes that the present case is different from the *Mumpower* case in that there are many indicia of Mr. Doughtie's intent, including his admissions of knowledge of the agreement, his presence during the formation of the agreement and his silence during such formation, his statements acknowledging the existence of the

---

[7] Evidence *aliunde* is literally evidence from outside the document, in the present case the deed.

agreement after his wife's death, and his signing of the deed in his wife's presence and handing it to Ms. Carpenter only to ask for its later return. Of course, Mr. Doughtie is still alive and the issues involving testamentary intent are not relevant to the discussion here, as they were in *Mumpower*. However, this Court finds that there was "evidence *aliunde* that there was a meeting of the minds of the grantor and grantee in a completed contract, the terms of which are expressed in the deed. . . ." Accordingly, this Court finds that the deed was signed and delivered by Mr. Doughtie and is therefore a valid written memorandum satisfying the Virginia Statute of Frauds.

The Court will also address the transfer of Mrs. Doughtie's interest in the condominium pursuant to her signature of the deed and delivery of the deed to Ms. Carpenter. As noted above, there is no evidence suggesting that Mrs. Doughtie knew that Mr. Doughtie requested return of the deed from Ms. Carpenter after it was delivered to her. While it is true that acceptance of a deed by the grantee(s) is required in order to complete the delivery of the deed, it is also true that subsequent assent by a grantee to a conveyance made without such grantee's knowledge is sufficient to constitute an acceptance where there has been a physical delivery of the deed, without reservation, by the grantor to a third party. *Hood v. Hood*, 384 A.2d 706 (1978); 23 Am. Jur. 2d, *Deeds*, § 175 (1975). Furthermore, where the grantor delivers the deed to a third person with the intention that the title thereby pass to the grantee, but the recipient has no authority to receive the deed in behalf of the grantee, the grantee may ratify what was done in his behalf, and the imperfect delivery thereupon becomes complete and perfected. *Id.* at § 181; *Parmelee v. Simpson*, 72 U.S. 81, 86, 18 L. Ed. 542 (1867); *see Central Land Co.*, 95 Va. at 227, 28 S.E. at 176 (filing Bill of Complaint is a form of signature, ratification, and acceptance). Acceptance is also presumed when a deed creates no obligation or burden upon the grantee and is beneficial to him, even where the transaction is consummated without the grantee's specific knowledge. 23 Am. Jur. 2d, *Deeds*, § 183-184 (1975).

Mrs. Doughtie's interest was, in essence, given as a deed of gift. The evidence is clear that she was gifting her joint interest in the condominium to the plaintiffs and that Mr. Doughtie was selling his interest for $25,000.00. In addition to the reasons just stated, since Mrs. Doughtie's interest was being gifted to the plaintiffs, such transfer is beneficial to the plaintiffs and an evidentiary inference of acceptance arises. Such inference was not rebutted by any evidence offered at trial. For all these reasons, the Court finds that Mrs. Doughties interest in the condominium was effective when the deed, signed by her and notarized as a beneficial gift to the plaintiffs, was delivered to Ms. Carpenter. As an alternate finding, the Court holds that Mrs. Doughtie's

interest in the condominium was accepted when the Bill of Complaint in this matter was filed by the plaintiffs.

### 3. Competence of Defendant to Sign Memorandum

While the Court concluded above that there was no physical or emotional impediment sufficient to deter Mr. Doughtie from responding to the offer of sale and gift made in his presence by his wife, the Statute of Frauds requires a written memorandum for enforcement of the underlying contract. The defendant suggests that he was not competent to sign the deed. However, in the absence of fraud, duress, or mutual mistake, an individual having the capacity to understand a written document, who signs that document without reading it, is bound by his signature. *First Va. Bank-Colonial v. Masri*, 245 Va. 461, 463, 428 S.E.2d 903, 904 (1993). The burden of proving lack of competence is upon the person who claims incapacity, and, if the person was competent to appreciate and understand the nature and effect of the document he signed and no unfair methods were used to induce him to sign it, then it makes no difference that the action may in retrospect be deemed unwise by him. *Chesapeake & Ohio Ry. v. Mosby*, 93 Va. 93, 98, 24 S.E. 916, 918 (1896).

The Virginia Supreme Court considered a similar issue in *Evans v. Slone*, 196 Va. 231, 83 S.E.2d 385 (1954). In that case, the grantor of a deed sought a declaration that the deed she signed was null and void. The evidence showed that, immediately after the funeral of the grantor's husband, there had been discussions between the grantor and her step-daughters regarding her desire to have a deed prepared that reflected her life estate in certain property, with the property passing to the step-daughters upon the grantor's death. Such a deed was subsequently prepared by an attorney contacted by the step-daughters, and the deed was signed by the grantor/step-mother after the attorney took it to her home and explained it to her. The grantor/step-mother contended that, at the time she signed the deed, she was in a grief stricken condition lacking the capacity to understand its purport. *Id.* at 234, 83 S.E.2d at 387.

The Court in *Evans* noted that "where parties reduce their contract to writing and acknowledge them before an officer there exists a strong presumption, in the absence of fraud and duress, that the contracts correctly set forth the understanding of the parties and equity will not lightly set them aside." *Id.* at 239, 83 S.E.2d at 390. The Court also noted that the "presumption that the instrument correctly expresses the intention of the parties and that it has been entered into in a proper legal manner must be overcome by clear and satisfactory proof." *Id.* The Supreme Court noted that

the Chancellor in that case found the evidence was far from proving a lack of competence and affirmed the decree.

In the present case, the defendant had numerous conversations regarding the underlying contract with the plaintiffs prior to the signing of the deed. He also was present during several conversations between his wife and the plaintiffs regarding this transaction. Ms. Carpenter testified that the defendant did not ask her any questions when she presented the deed to him. She also noted that the defendant helped Mrs. Doughtie sign the deed. Mr. Doughtie also allowed the deed to be notarized by Ms. Carpenter and had the presence of mind to ask that she return the deed to him before she left the home so that he might hold the deed until he was paid by the plaintiffs. Furthermore, Mr. Doughtie did not seek to disclaim the underlying contract or the deed until several months after the deed was signed, and, during that interim period, he had several conversations with the plaintiffs regarding his desire to conclude the transaction contemplated by the contract. This Court is not without sympathy for the grief that Mr. Doughtie must have felt while he watched his ill wife. However, the foundation of our system of contracts must suffer a presumption in favor of the validity of such signed and notarized documents. Moreover, Mr. Doughtie did not sign the deed in a vacuum, as explained above. There were many indicia of his pre-signing intent, as well as his post-signing intent. Accordingly, the Court finds that Mr. Doughtie was competent to sign the deed.

## D. *Remedy*

Based upon the evidence adduced at the trial of this matter and the Court's findings of fact and conclusions of law reflected in this Opinion and Order, specific performance of the contract entered into between Mr. Doughtie and the plaintiffs is appropriate.

## IV. *Conclusion and Final Decree*

For the reasons stated above, the Court grants the plaintiffs' prayer for specific performance of the contract alleged and further decrees that the defendant shall deliver a good and sufficient general warranty deed to plaintiffs for the subject condominium property at the same time that the plaintiffs deliver $25,000.00 to the defendant. If no appeal of this Opinion and Order is timely filed, such exchange shall take place, at the latest, within ten days of the expiration of the appeal time in this matter. If an appeal is timely filed, then an appeal bond is set at $30,000.00. It is so ordered.